**Iraida LIMA–RIVERA; Iraida Rivera, Plaintiffs,**

v.

**UHS OF PUERTO RICO, INC., et al., Defendants.**

**Civil No. 04–1798(GAG).**

United States District Court, D. Puerto Rico.

Feb. 22, 2007.

Carlos A. Ortiz–Morales, Carlos A. Ortiz Morales Law Office, San Juan, PR, Ricardo Ruiz–Diaz, Ruiz & Reyes Law Offices, Fajardo, PR, for Plaintiffs.

Sigrid Lopez–Gonzalez, Sigrid Lopez Gonzalez Law Offices, Orlando H. Martinez–Echeverria, Orlando H. Martinez Law Office, Igor Dominguez–Perez, Igor J. Dominguez Law Office, San Juan, PR, Luis R. Lugo–Emanuelli, Lugo Emanuelli Law Office, Fajardo, PR, Benjamin Morales–Del–Valle, Ramonita Dieppa–Gonzalez, Morales Morales Law Offices, Pedro J. Cordova–Pelegrina, Miranda Cardenas & Cordova Law Office, San Juan, PR, for Defendants.

## OPINION AND ORDER

GELPI, District Judge.

Plaintiffs Iraida Lima–Rivera and her mother Iraida Rivera filed this action, alleging that Defendants' medical treatment of Lima–Rivera and her baby violated the Emergency Medical Treatment and Active Labor Act and constituted medical malpractice under Puerto Rico law. Co-defendant UHS moves to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. After reviewing the pleadings and pertinent law, the court **DENIES** UHS' motion to dismiss (Docket No. 120).

## I. Relevant Factual & Procedural Background

The following factual summary is taken from Plaintiffs' second amended complaint. *See* Docket No. 82. On May 1, 2003, Plaintiff Lima–Rivera, eighteen years of age and thirty five weeks pregnant, was admitted to the Hospital San Pablo del Este ("HSPE") with hypertension and preeclampsia. *Id.* at 14. Despite her preeclampsia and erratic blood pressure, Lima–Rivera was discharged from HSPE on May 6, 2003. *Id.* at 16. Two days later, on May 8, 2003, Lima–Rivera returned to HSPE's Emergency Room with high blood pressure, shortness of breath, preeclampsia, and in labor. *Id.* at 17. On May 9, 2003, a cesarean section was performed on Lima–Rivera, and she delivered a baby boy. *Id.*

After the cesarean section, the newborn was transferred to HSPE's regular nursery. *Id.* at 19. At the nursery, the baby presented tachypnea and evidence of hypotonia without any action being taken by hospital personnel. *Id.* On May 10, 2003, the baby developed upper gastrointestinal bleeding and vomited blood. *Id.* He was then transferred to HSPE's intensive care unit. *Id.* Some time after, a decision is made to transfer the baby to Hospital Interamericano de Medicina Avanzada ("HIMA"). *Id.* When the baby left HSPE, he was totally unstable, with tachypnea and active upper gastrointestinal bleeding. *Id.* at 20. On arrival, the baby was described as "crucially ill r/o sepsis." *Id.* at 21. Laboratory tests performed on the baby disclosed that he was suffering respiratory alkalosis. *Id.* The baby was then placed on antibiotics and antacids. *Id.* On May 12, 2003, Dr. Jane Estacnoly evaluated the baby and ordered a nutrition plan. *Id.* The baby remained tachypneic and hypoonic. *Id.* Later that day, the baby developed a cardiac arrest and died. *Id.* at 22.

On August 6, 2004, Plaintiffs filed the instant case, alleging that Defendants' medical treatment of Lima–Rivera and her baby violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), as amended, 42 U.S.C. § 1395dd. *See* Docket No. 1. The complaint also included a Puerto Rico medical malpractice claim under Articles 1802 and 1803 of Puerto Rico's Civil Code, P.R. Laws Ann. tit. §§ 5141–5142. *Id.* Plaintiffs amended their complaint on April 18, 2005 and Octo-

ber 11, 2005. *See* Docket Nos. 49, 82. On August 1, 2006, Co-defendant UHS, owner and operator of HSPE, moved to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. Plaintiffs filed their opposition to UHS' motion to dismiss on August 21, 2006. *See* Docket No. 131. On September 18, 2006, UHS filed a reply to Plaintiffs' opposition. *See* Docket No. 151.

## II. Standard of Review

Under Rule 12(b)(1), a defendant may move to dismiss an action against him for lack of federal subject-matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). Since federal courts have limited jurisdiction, the party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. *See Murphy v. United States,* 45 F.3d 520, 522 (1st Cir.1995) (citing *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57, 60 (1st Cir.1993), cert. denied, 510 U.S. 823, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993)). In assessing a motion to dismiss for lack of subject-matter jurisdiction, a district court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs." *Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir.1998) (citing *Royal v. Leading Edge Prods., Inc.,* 833 F.2d 1, 1 (1st Cir.1987)). Additionally, a court may review any evidence, including submitted affidavits and depositions, to resolve factual disputes bearing upon the existence of jurisdiction. *See Aversa v. United States,* 99 F.3d 1200, 1210 (1st Cir.1996).

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). When ruling on a motion to dismiss grounded on Rule 12(b)(6), the court will take the facts affirmatively alleged by plaintiff as true and construe the disputed facts in the light most favorable to the plaintiff without crediting conclusory allegations. *See Berezin v. Regency Savings Bank,* 234 F.3d 68, 70 (1st Cir.2000); *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994). The court may grant dismissal only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## III. Legal Analysis

UHS has moved to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. Plaintiffs argue that the court has jurisdiction pursuant to EMTALA and that they have stated a valid EMTALA claim. The court will examine the pleadings to determine whether Plaintiffs have established that EMTALA applies to the facts of this case and if so whether Plaintiffs have stated an EMTALA claim.

### A. Subject–Matter Jurisdiction

In 1986, Congress enacted EMTALA in response to an increasing practice of hospital emergency rooms of rejecting patients with emergency conditions because they have no medical insurance. *See* H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986). To alleviate this concern, EMTALA imposes certain requirements on all hospitals that have executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. § 1396cc. *See* 42 U.S.C. § 1395 dd(e). Specifically, EMTALA requires that "a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance." *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1190

(1st Cir.1995); 42 U.S.C. § 1395dd(a). Additionally, EMTALA provides that "if 'any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition,' the hospital must try to stabilize that condition, and can shift the patient to another institution only in accordance with EMTALA's transfer provisions." *Lopez–Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir.1999) (quoting 42 U.S.C. § 1395dd(b)). Under EMTALA's transfer provision, "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized ..., the hospital may not transfer the individual unless the hospital complies with certain stipulated conditions." 42 U.S.C. § 1395dd(c)(1). To enforce these obligations, EMTALA created a private cause of action against "participating hospitals" for damages incurred from violations of the Act. 42 U.S.C. § 1395(d)(2)(A). In evaluating these private causes of action, many courts have held that EMTALA was enacted specifically to avoid "dumping" of patients lacking medical insurance and that it should not be regarded as a federal medical malpractice statute. *Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83 (1st Cir.2000) (citing *Bryan v. Rectors and Visitors of the Univ. of Va.,* 95 F.3d 349, 351 (4th Cir.1996)).

■ Plaintiffs argue that the court has subject-matter jurisdiction over this case pursuant to EMTALA's stabilization and transfer provisions. In support thereof, Plaintiffs state that Lima–Rivera's son "came to the hospital" for purposes of EMTALA' stabilization and transfer provisions when he was born at the hospital's operating room. *See* Docket No. 82 at 17–18. Despite being a high risk neonate, the baby was transferred to HSPE's regular nursery. *Id.* at 19. At the nursery, the baby presented tachypnea and evidence of hypotonia, which are medically considered critical conditions. *Id.* Subsequently, the baby developed upper gastrointestinal bleeding and vomited blood. *Id.* At that point, the baby was transferred to HSPE's intensive care unit. *Id.* Despite the baby's unstable condition, a physician at HSPE decided to transfer the baby to HIMA, where the baby died two days later. *Id.* at 20–22.

Defendants contend that they were not required to comply with the stabilization and transfer provisions of EMTALA because Lima–Rivera's newborn was admitted as an inpatient in HSPE's regular nursery. The most relevant case to the facts presented by Plaintiffs is *Lopez–Soto.* In that case, a pregnant woman came to the hospital experiencing normal labor pains. *Lopez–Soto,* 175 F.3d at 171. Hospital personnel brought her to the maternity ward where she was examined and admitted. *Id.* Unable to induce the woman's labor, the obstetrician ordered a cesarean section, and the woman gave birth to a baby boy. *Id.* The infant emerged in severe respiratory distress. *Id.* The pediatrician on call decided that the baby required specialized care and began making arrangements to transfer him to a hospital with a functioning neonatal intensive care unit. *Id.* Before the transport occurred, the pediatrician determined that the baby was suffering from pulmonary pneumothorax. *Id.* Without stabilizing the baby, the pediatrician transferred the baby to the receiving hospital where he died the next day. *Id.* Subsequently, the deceased baby's parents brought suit pursuant to EMTALA against the hospital and several caregivers. *Id.* The district court ruled that EMTALA's stabilization and transfer requirements had not been triggered because the newborn had not come to the hospital's emergency room seeking treatment for his respiratory distress, but rather, had come to the hospital via the operating room. *Id.* at 172. On appeal, the First Circuit reversed and held that emergency room arrival is not a prerequisite to

liability under EMTALA's stabilization and transfer provisions. *Id.* at 173–74. In doing so, the First Circuit joined other federal and state courts which have held that EMTALA's stabilization and transfer provisions are not limited to patients who initially arrive at the emergency room. *See Reynolds v. Mercy Hosp.*, 861 F.Supp. 214, 222 (W.D.N.Y.1994); *Smith v. Richmond Hospital*, 243 Va. 445, 416 S.E.2d 689, 692 (1992).

Defendants contend that *Lopez–Soto* does not apply to this case because the baby in *Lopez–Soto* had a clear medical condition upon birth and was never admitted to the hospital as an inpatient. The court disagrees. The court in *Lopez–Soto* did not limit its holding to babies that had a clear medical condition upon birth and that were not admitted as inpatients.[1] Instead, the court held that the newborn's arrival in the hospital's operating room and the hospital's prompt detection of an emergency medical condition, if proven, would be sufficient to trigger EMTALA's stabilization and transfer requirements. *Lopez–Soto*, 175 F.3d at 177.

Applying *Lopez–Soto*, the court finds that Plaintiffs have sufficiently alleged that Lima–Rivera's newborn arrived at HSPE when he was born in the operating room after a cesarean section. *See* Docket No. 82 at 17–18. Likewise, Plaintiffs have sufficiently pleaded that HSPE promptly detected that the baby was suffering from an emergency medical condition. Within 24 hours of the baby's birth, hospital personnel at HSPE reported that the baby was presenting tachypnea and evidence of hypotonia, which are medically considered critical conditions. *Id.* at 19. Subsequently, the baby developed upper gastrointestinal bleeding and vomited blood. *Id.*

Additionally, the facts of this case implicate the court's concerns in *Lopez–Soto*. Those concerns include the possibility that once "a hospital determines that a patient on a ward has developed an emergency medical condition, it may fear that the costs of treatment will outstrip the patient's resources, and seek to move the patient elsewhere." *Lopez–Soto*, 175 F.3d at 177. The court in *Lopez–Soto* found that "Congress's preoccupation with patient dumping is served, not undermined, by forbidding the dumping of *any* hospital patient with a known, unstabilized, emergency condition." *Id.*

 Defendants ask the court to disregard *Lopez–Soto* because the CMS clarified in 2003 that EMTALA ceases to apply when an individual is admitted as an inpatient. *See* 42 C.F.R. § 489.24(d)(2)(i) (stating that [i]f a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual). The court cannot agree. Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory

---

1. This is assuming the baby in *Lopez–Soto* was not an inpatient, which is unclear. The Centers for Medicare and Medicaid Services ("CMS") define an inpatient as "an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services ... with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight." 42 C.F.R. § 489.24(b). This definition could plausibly include the baby in *Lopez–Soto* because after his birth and before the pediatrician decided that the baby needed specialized care there was an expectation that he would remain at least overnight at the hospital.

process." *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (citing *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)); *see also* Charles H. Koch, Jr., 1 *Admin. L. & Prac.* § 4.11 (2d ed. 2003) ("[L]egislative rules are binding on courts as an extension of legislative power, whereas interpretative rules have only the effect courts choose to give them."); 2 Am.Jur.2d *Administrative Law* § 161 (2003) ("Interpretive rules are not intended to have any legal effect and do not have the force and effect of law. Accordingly, an interpretive rule is not binding on a court, which may disagree with an administrator's interpretation of a statute...."). Furthermore, Rule 489.24(d)(2) was not in effect when Defendants allegedly violated EMTALA. CMS published Rule 489.24(d)(2) on September 9, 2003. *See* 42 C.F.R. § 489.24(d)(2). The alleged violations of EMTALA's stabilization and transfer provisions occurred four months before, on May 9–10, 2003. Generally, "the law disfavors retroactivity, and courts should not give administrative rules retroactive effect in the absence of an express statutory grant of retroactive rulemaking power by Congress." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208–9, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). This general ban on retroactive rulemaking applies with the same force whether the agency issues a "legislative rule" pursuant to a specific statutory directive or an "interpretive rule" construing the meaning of authorizing legislation. *Health Ins. Ass'n of America, Inc. v. Shalala,* 23 F.3d 412, 423–24 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1064. For these reasons, the court will not disregard *Lopez–Soto* in favor of the CMS' interpretive rule. In light of the above, the court finds that it has subject-matter jurisdiction over this case pursuant to EMTALA's stabilization and transfer provisions.

## B. EMTALA Claim

■■■■ To establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition. *Correa,* 69 F.3d at 1190 (citing *Miller v. Medical Ctr. of S.W. La.,* 22 F.3d 626, 628 (5th Cir. 1994); *Stevison v. Enid Health Sys., Inc.,* 920 F.2d 710, 712 (10th Cir.1990)). To state an EMTALA violation, Plaintiffs alleged the following.[2] At all relevant times, HSPE was a provider of hospital and emergency medical services under the Federal Medicare Program. *See* Docket No. 82 at 3. Lima–Rivera's newborn arrived at HSPE seeking treatment when he was birthed in the operating room after a cesarean section. *Id.* at 17–18. At the nursery, the baby presented tachypnea and evidence of hypotonia, which are medically considered critical conditions. *Id.* at 19. No action was taken by the HSPE medical staff. *Id.* Subsequently, the baby

---

**2.** To defeat Plaintiffs' allegations, UHS included in its motion to dismiss materials outside the pleadings. Because UHS is using these materials to establish that Plaintiffs have failed to state a claim upon which relief can be granted and because UHS is not asking the court to convert this motion into a motion for summary judgment, the court will not consider these materials in ruling on the 12(b)(6) motion. *See Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002).

developed upper gastrointestinal bleeding and vomited blood. *Id.* At that point, the baby was transferred to HSPE's intensive care unit. *Id.* Despite the baby's unstable condition, a physician at HSPE decided to transfer the baby to HIMA, where the baby died two days later. *Id.* at 20–22. Because Plaintiffs have sufficiently pleaded an EMTALA violation, the court will not dismiss Plaintiffs' complaint for failure to state a claim upon which relief can be granted.

## IV. Conclusion

For the foregoing reasons, UHS' motion to dismiss (Docket No. 120) is hereby **DENIED.**

**SO ORDERED.**