NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ANNE P. MULLIGAN, | ) |
| | ) Supreme Court No. S-17497 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-17-09207 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| GALEN HOSPITAL ALASKA, INC. | ) AND JUDGMENT[*] |
| d/b/a ALASKA REGIONAL HOSPITAL, | ) |
| | ) No. 1762 – April 29, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Anne P. Mulligan, pro se, Anchorage, Appellant. Roger F. Holmes, Biss and Holmes, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

1. Anne P. Mulligan — self-represented — filed a "medical malpractice" lawsuit against Alaska Regional Hospital, alleging that the Hospital's emergency room doctor wrongfully refused to treat her during an April 19, 2017 emergency room visit. The Hospital answered, denying any medical malpractice or other

_____

[*] Entered under Alaska Appellate Rule 214.

wrongful conduct. The Hospital later filed a motion for summary judgment seeking dismissal of Mulligan's lawsuit.[1]

2. Support for the Hospital's motion included an affidavit from the board-certified emergency room doctor who saw and treated Mulligan on the day in question, authenticating the medical records for Mulligan's relevant emergency room visits. In the affidavit the doctor described the treatment provided Mulligan on April 19 and a previous April 17 visit. The doctor asserted that Mulligan was not refused necessary medical treatment and that her treatment met the applicable standard of care. The Hospital's filings also included an affidavit from its patient safety and risk management director, authenticating other records regarding Mulligan's visits to the emergency room and describing Mulligan's interactions with hospital staff on the day in question.

3. Mulligan did not respond to or oppose the Hospital's summary judgment motion;[2] specifically, then, she did not object to the admissibility of the Hospital's evidence or present any contradictory evidence.

---

[1]    *See* Alaska R. Civ. P. 56(a) ("A party . . . may, at any time after the expiration of 20 days from the commencement of the action . . . move for a summary judgment in the party's favor upon all or any part thereof.").

[2]    *See* Alaska R. Civ. P. 56(e) ("[An] . . . adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

4.	The superior court granted the Hospital's summary judgment motion and dismissed Mulligan's lawsuit.[3]  Mulligan now appeals, asking us to determine whether the superior court erred by granting summary judgment.[4]

5.	The evidence the Hospital submitted — unobjected to and uncontradicted by any other evidence in the record — reflects the following sequence of events in April 2017.

A.	What the medical records reveal

On April 17 Mulligan went to the Hospital's emergency room, complaining of left shoulder pain from "her arm being pulled while being arrested a few hours ago." An emergency room doctor evaluated Mulligan and ordered an imaging exam; the doctor and a radiologist reviewed the images.  Mulligan was diagnosed with "acute pain of left shoulder, shoulder sprain, and AC separation left."[5]  The doctor noted that Mulligan had full range of motion in her shoulder; Mulligan was given a sling and instructed to follow up with an orthopedic doctor if her pain did not resolve.

Two days later Mulligan was involved in another incident to which police responded.  After Mulligan requested medical care, an ambulance transported her to the Hospital.  At around 5:00 p.m. a different emergency room doctor examined Mulligan.

---

[3]	*See* Alaska R. Civ. P. 56(c) ("Judgment shall be rendered forthwith if the pleadings, . . . together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.").

[4]	We  review a grant of summary judgment de novo.  *Hymes v. DeRamus*, 222 P.3d 874, 880 (Alaska 2010) (citing *Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265, 1269 (Alaska 2001)).

[5]	"AC" is a common medical abbreviation for "acromioclavicular," the joint between the collar bone and shoulder blade.  *AC*, *acromioclavicular*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

The doctor noted Mulligan's "complaints of moderate throbbing bilateral upper extremity pain radiating to her bilateral shoulders onset 2 days ago after being arrested . . . . She also complains of mild aching neck pain." The doctor diagnosed "muscle strain" and discharged Mulligan with instructions to follow up with her primary physician.

B.      What the doctor's affidavit reveals

The affidavit by the second emergency room doctor explained the events involving Mulligan as follows. During Mulligan's first visit, she was evaluated by nurses and an on-call doctor; an x-ray "showed no acute injury," and she was discharged. When Mulligan arrived again two days later, the second doctor saw her after reviewing the medical chart from the first visit; Mulligan had "essentially the same subjective complaints," and the doctor was "unable to elicit any . . . symptoms that would suggest [Mulligan's] condition had changed . . . or that she was in need of any emergent medical treatment." The doctor indicated that Mulligan "exhibited no emergency medical condition" but that she was diagnosed with "muscle strain" based solely on her complaints.

After interactions with hospital staff and police in areas near the emergency room, later that evening Mulligan returned to the admitting window and demanded treatment. The doctor spoke with and observed Mulligan; the doctor determined that her "medical condition had not changed since" her earlier discharge and that "she exhibited no signs or symptoms of an emergency medical condition, nor any medical condition, requiring a further examination." The doctor advised Mulligan that "there was no medical reason for [her] to be seen again" and that "she should leave the [Hospital] premises."

C.    What the risk management director's affidavit and records reveal

According to safety records authenticated by the Hospital's risk management director and the director's affidavit statements, after Mulligan was discharged from the emergency room early in the evening on April 19, she refused to leave the Hospital. Pursuant to hospital protocol, hospital security was called and Mulligan was given an hour to find a ride and leave the premises. When that time expired and security asked Mulligan to leave, she barricaded herself in a restroom adjacent to the emergency room; security personnel physically removed her from the restroom. At that point Mulligan demanded to be seen again by the emergency room doctor. Mulligan was issued a trespass notice, and eventually the police were called to remove her from the Hospital.

D.    What Mulligan's complaint reveals

In Mulligan's unsworn statement of her complaint against the Hospital — which would be inadmissable for opposing summary judgment[6] — she describes her April 17 interaction with the police and then describes her visit to the emergency room that day. Her description of the emergency room visit is consistent with the Hospital's evidence. Mulligan's description of her early-evening April 19 visit to the emergency room also is consistent with the Hospital's evidence. Mulligan's description of the events after her discharge from the emergency room on April 19 is as follows:

> Anne was put in a quiet room, and two local [police] officers came and spoke with Anne and left. Anne went and sat in the emergency room at [the] Hospital trying to find a ride home. At about 11PM at night 3 white male security guards

---

[6]    *See* Alaska R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading . . . .").

approached Anne and told her that she needed to leave immediately and if Anne didn't leave then they were going to call [the police] and have Anne ban[ned] from [the Hospital emergency room]. Anne got up [and] went to use the bathroom, the security guards came and banged on the bathroom door and told Anne that she needed to leave immediately. Anne exited the bathroom and went to the window in the [emergency room] and asked to be seen again because she was still in a lot of pain. The nurse behind the desk started typing in Anne's symptoms, when the staff in the [emergency room] saw who I was yelled that there was nothing wrong with Anne and that Anne was fine and that they were not going to see Anne again. The [emergency room] staff also told the security guards to have Anne personally escorted out of the [emergency room].

Nowhere in Mulligan's complaint does she allege that: (1) she had a medical emergency necessitating additional emergency room treatment the second time she came to the admitting window; (2) she sought emergency medical treatment from another provider after being escorted from the Hospital; or (3) the alleged refusal to treat her the second time she approached the admitting window caused her any monetary or physical harm.

6.      Generously interpreting Mulligan's complaint and appeal briefing as a self-represented litigant,[7] her malpractice action appears to focus solely on the Hospital's refusal to provide additional emergency room treatment when she made her second request on the evening of April 19. This suggests a claim that the Hospital breached a standard of care or other duty requiring the emergency room doctor to re-

---

[7]      *See Tobar v. Remington Holdings LP*, 447 P.3d 747, 753 (Alaska 2019) ("[P]leadings of self-represented litigants should be held to a less stringent standard and . . . their briefs are to be read generously.").

examine Mulligan in the evening on April 19 after her earlier discharge from the emergency room.

7.     There is no presumption of negligence by a medical malpractice defendant.[8] Alaska Statute 09.55.540 outlines a medical malpractice plaintiff's burden of proof for establishing negligence:

> (a)     In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence
>
> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>
> (3) that as a proximate cause of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not have otherwise been incurred.

As early as 1984 we held that expert witness testimony is necessary to prove breach of a health care professional's duty, excepting non-technical matters involving negligence evident to lay people.[9] The legislature later enacted a statute establishing specific expert witness qualification standards in professional malpractice actions based on negligence:

---

[8]     AS 09.55.540(b); *Parker v. Tomera*, 89 P.3d 761, 766 (Alaska 2004).

[9]     *See, e.g.*, *Hertz v. Beach*, 211 P.3d 668, 680 (Alaska 2009); *Trombley v. Starr-Wood Cardiac Grp., PC*, 3 P.3d 916, 919 (Alaska 2000); *Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska 1984).

(a) In an action based on professional negligence, a person may not testify as an expert witness on the issue of the appropriate standard of care unless the witness is

(1) a professional who is licensed in this state or in another state or country;

(2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and

(3) certified by a board recognized by the state as having acknowledged expertise and training directly related to the particular field or matter at issue.[10]

8. Relatedly, the federal Emergency Medical Treatment and Active Labor Act (EMTALA) sets out a legal duty for Medicare-participating hospitals operating emergency rooms.[11] EMTALA imposes two main requirements: provide an appropriate medical screening examination and stabilize a patient experiencing an emergency medical condition before refusing treatment to or transferring the patient.[12] Regarding medical screening, the statute requires:

---

[10] AS 09.20.185(a). There is an exception if no state-recognized certification board exists in a particular field or subject matter. AS 09.20.185(b).

[11] 42 U.S.C. § 1395dd (2018).

[12] *See Lima-Rivera v. UHS of Puerto Rico, Inc.*, 476 F. Supp. 2d 92, 98 (D.P.R. 2007) ("To establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.").

> [I]f any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an *appropriate medical screening examination* within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an *emergency medical condition* . . . exists.[13]

The Hospital evidently is subject to EMTALA; it thus was required to conduct an appropriate medical screening examination to determine whether Mulligan had an "emergency medical condition," defined as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —
>
> > (i) placing the health of the individual . . . in serious jeopardy,
> >
> > (ii) serious impairment to bodily functions, or
> >
> > (iii) serious dysfunction of any bodily organ or part . . . .[14]

9. The Hospital's filings included an affidavit from the emergency room doctor who treated and later observed Mulligan upon her second April 19 visit and an affidavit from its risk management director setting out what occurred between Mulligan's two visits. According to the doctor's affidavit, the doctor is a licensed medical doctor and is board certified in emergency medicine, the specialty in question. The affidavit indicates that the hospital met the standard of care and complied with EMTALA. The doctor's affidavit specifically states that there was no basis to suggest that Mulligan's

---

[13]     42 U.S.C. § 1395dd(a) (emphasis added).

[14]     42 U.S.C. § 13955dd(e)(1)(A).

medical condition had changed since her earlier visit such that emergency room treatment was necessary.

10.     Mulligan bore the burden to produce some evidence, such as an expert affidavit, establishing that the Hospital failed to meet the standard of care or its legal duty and caused her injuries.[15] She was required "to set forth specific facts showing that [she] could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists."[16] But by failing to oppose the Hospital's motion or to present admissible evidence contradicting the Hospital's evidence, Mulligan failed to establish the existence of a material factual dispute regarding malpractice or an EMTALA violation. We have declined to "require judges to warn pro se litigants on aspects of procedure when the pro se litigant has failed to at least file a defective pleading."[17] Mulligan filed no opposition or other response and thus was "not entitled to notification of the proper procedure to defend against the summary judgment motion."[18] A court may grant an unopposed summary judgment

---

[15]     *See Hagen v. Strobel*, 353 P.3d 799, 804 (Alaska 2015) (concluding that, absent conflicting testimony, attestation of qualified expert that medical malpractice defendants met applicable standard of care was sufficient to support summary judgment in defendants' favor); *Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska 1984) (affirming summary judgment because adverse party "presented no expert affidavits and did not show, based on the evidence that was presented, that a reasonably arguable case of medical negligence existed").

[16]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014) (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

[17]     *Bauman v. State, Div. of Family & Youth Serv.*, 768 P.2d 1097 (Alaska 1989).

[18]     *Capolicchio v. Levy*, 194 P.3d 373, 379 (Alaska 2008) (determining *Bauman* rule applies where pro se litigant filed no opposition to summary judgment

(continued...)

motion if the moving party is entitled to judgment as a matter of law on the evidence presented,[19] and the superior court did not err by granting the Hospital's summary judgment motion and dismissing Mulligan's complaint.

11.     We AFFIRM the superior court's grant of summary judgment and the dismissal of Mulligan's lawsuit.

---

[18]     (...continued) motion).

[19]     *See id.*