Caryl J. KEIP, individually and as Special Administrator of the Estate of Walter F. Keip (Deceased), Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVICES, Respondent-Respondent.†

Court of Appeals

*No. 99–0193. Submitted on briefs July 9, 1999.—Decided December 23, 1999.*

2000 WI App 13

(Also reported in 606 N.W.2d 543.)

†Petition to review denied.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Sara Buscher* of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Bruce A. Olsen,* assistant attorney general, and *James E. Doyle,* attorney general.

A nonparty brief was filed by *James A. Jaeger,* Madison and *Margaret Hickey,* Waukesha for Elder Law Section of The State Bar of Wisconsin.

A nonparty brief was filed by *Mitchell M. Hagopian* and *Jessica Gilkison* of Monona for Elder Law Center of the Coalition of Wisconsin Aging Groups.

Before Vergeront, Roggensack and Deininger, JJ.

¶ 1. DEININGER, J. Caryl Keip, individually and as special administrator of her late husband's estate, appeals an order which affirmed the decision of

the Department of Health and Family Services to count her individual retirement account (IRA) as an asset in determining her husband's eligibility for medical assistance (MA). We conclude that the department erred in interpreting the federal "spousal impoverishment" provisions to require the inclusion of a community spouse's IRA as an asset when determining the MA eligibility of the institutionalized spouse. Accordingly, we reverse and instruct the circuit court to remand the matter to the Department of Health and Family Services for a redetermination of Walter Keip's eligibility for MA consistent with the opinion which follows.

## BACKGROUND

¶ 2. The facts underlying this review of an administrative decision are undisputed. Caryl Keip retired in September 1996 and rolled her employee pension into an IRA. Caryl's husband, Walter, was admitted to Waunakee Manor, a Medicare- and Medicaid-certified nursing home, on October 17, 1996, following a period of hospitalization for a broken hip. Walter returned home before Christmas and continued to live at home until April 6, 1997, when he was admitted to the hospital for emergency care. On April 23, 1997, Walter returned to Waunakee Manor. In May, Caryl realized that she could no longer provide adequate care for her husband at home, and Walter remained at Waunakee Manor until he died in December 1997.

¶ 3. In June 1997, Caryl began the MA application process on Walter's behalf. She learned, however, that the department intended to count her IRA as an asset in determining Walter's eligibility for MA, and that the inclusion of the IRA would render him ineligi-

ble.[1] In order to accelerate Walter's eligibility date, Caryl in July used about half (approximately $80,000) of the funds in her IRA to purchase an irrevocable fixed payment annuity. This type of annuity does not count as an asset for MA eligibility purposes. Walter thus qualified for MA as of August 1997, but the department denied him benefits for the period prior to that month.

¶ 4. The Keips requested a "fair hearing" before the Division of Hearings and Appeals in order to challenge the denial of MA for Walter prior to August 1, 1997. *See* § 49.45(5), STATS.[2] Following the hearing, the hearing examiner issued a proposed decision which concluded that Caryl's IRA should not have been included as a resource in determining Walter's MA eligibility. The department's Final Decision, however, concluded that, under the "spousal impoverishment provisions" of federal law,[3] Caryl's IRA was correctly determined to be a countable resource in determining her husband's MA eligibility. Caryl, individually and as special administrator of Walter's estate, appealed the department's decision to the Dane County Circuit Court, which upheld the administrative determination. Caryl appeals the circuit court's order, claiming that the department erred in concluding that her IRA

---

[1] The initial determinations were actually made by the Dane County Department of Human Services, acting on behalf of the Department of Health and Family Services. *See* § 49.45(2)(a)3, STATS.

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[3] Congress enacted the "spousal impoverishment provisions" as a part of the Medicare Catastrophic Coverage Act of 1988. The provisions relevant to the present dispute are at 42 U.S.C. § 1396r–5 (1994).

was a countable resource in determining Walter's eligibility for MA.

## ANALYSIS

■

¶ 5. The resolution of this appeal requires us to examine several federal statutes and regulations, their interrelationships and their application to the present facts.[4] We are thus presented with a question of law, and we review the department's decision, not that of the circuit court. *See Gordon v. State Med. Examining Bd.*, 225 Wis. 2d 552, 556, 593 N.W.2d 481, 483 (Ct. App. 1999). We discuss below what level of deference, if any, we must accord the department's interpretation of the applicable statutes and regulations. First, however, we describe the hearing examiner's rationale for excluding Caryl Keip's IRA as a resource when determining her husband's eligibility for MA, and the department's justification for including this resource.

¶ 6. The hearing examiner, in concluding that Caryl's IRA should be excluded, relied on a federal requirement that "the methodology to be employed by the Wisconsin MA program in determining income and asset eligibility for the aged, blind, and disabled can be

---

[4] Our present foray into the thicket of statutes and rules governing eligibility for medical assistance prompts us to second the following sentiments:

> Anyone who works with medical assistance statutes begins by appreciating that the federal and state statutes are extremely complex and may fairly be described as incomprehensible. The statutes are characterized by ambivalence and ambiguity, by a confusing mix of means-tested programs and entitlements, and by uneasy compromises among different and often conflicting policies.

*Tannler v. DHSS*, 211 Wis. 2d 179, 191, 564 N.W.2d 735, 741 (1997) (Abrahamson, C.J., concurring) (footnote omitted).

no more restrictive than the methodology used in the federal Supplemental Security Income (SSI) program."[5] The federal SSI eligibility requirements, in turn, provide that when determining the eligibility of one spouse for SSI benefits, the resources of an "ineligible" spouse "who is living with" the applicant are deemed to be assets of the applicant, *except* that "pension funds which the ineligible spouse may have are . . . excluded," and IRAs are considered to be "pension funds."[6] Thus, the hearing examiner concluded that controlling federal law required that Caryl's IRA be excluded as an asset in determining Walter's MA eligibility. Furthermore, the examiner concluded that this interpretation was consistent with Wisconsin law and policy, citing, for example, the department's *Medical Assistance Handbook,* Appendix 23.4.0.5.

¶ 7. The department, however, rejected the hearing examiner's reasoning, and instead concluded as follows:

> The hearing examiner failed to consider spousal impoverishment requirements. Provisions of the law governing spousal impoverishment supersede any inconsistent provision of Title 19. 42 U.S.C. 1396r–5(a)(3). The examiner's failure to recognize that the deceased institutionalized spouse applied for medical assistance under the protections offered by the spousal impoverishment portion of the law caused him to erroneously rely on inapplicable provisions.
>
> Citing 42 U.S.C. 1396r–5(a)(3), petitioner argues that "the spousal impoverishment protection provisions do not apply to 'the determination of what constitutes income or resources' or to 'the

---

[5] *See* 42 U.S.C. § 1396a(r)(2)(A)(i) (1994).
[6] *See* 20 C.F.R. § 416.1202(a) (1999).

methodology and standards for determining and evaluating income or resources.' " However, petitioner conveniently ignores the language preceding the quoted provisions where it is stated that the spousal impoverishment protection provisions are inapplicable "[e]xcept as this section specifically provides. . . ."

The section specifically provides in 5(c)(1) and (2) that all resources owned by either or both spouses are considered available to the institutionalized spouse in determining eligibility. Excluded resources are restricted to those expressly cross-referenced in 5(c)(5). Neither the cross-referenced provisions of 42 USC 1382b nor 20 CFR 416.1210, which essentially paraphrases the cross-referenced statute, contain any reference to pension funds as an excluded resource.

Petitioner relies on 20 CFR 416.1202, which concerns deeming of resources under SSI generally and states that "[i]n addition to the exclusion listed in 416.1210, pension funds which the ineligible spouse may have are also excluded." There is no evidence, however, that Congress intended to supplement the resource exclusion list in this manner regarding spousal impoverishment cases.

The County therefore correctly counted Mrs. Keip's IRA as an asset in determining Mr. Keip's MA eligibility.

¶ 8. Thus, in a nutshell, the department believes that the following language in the later-enacted "spousal impoverishment" provisions shows that Congress intended the resource exclusions enumerated in the spousal impoverishment law to supplant rather than supplement the resource exclusions applicable in SSI eligibility determinations:

(a) Special treatment for institutionalized spouses

387

(1) Supersedes other provisions
In determining the eligibility for medical assistance of an institutionalized spouse . . . *the provisions of this section supersede any other provision of this subchapter . . . which is inconsistent* with them.

. . . .

(3) Does not affect certain determinations
*Except as this section specifically provides*, this section does not apply to—
(A) the determination of what constitutes income or resources, or
(B) the methodology and standards for determining and evaluating income and resources.

42 U.S.C. § 1396r–5(a) (1994) (emphasis added). The "specific provisions" of § 1396r–5 which, according to the department, are inconsistent with the exclusion of a spouse's IRA for the purpose of eligibility determinations are the following: (1) "the total value of the resources to the extent either the institutionalized spouse or the community spouse has an ownership interest" are to be *included* in determining MA eligibility; and (2) "resources" as defined in § 1396r–5 "does not include" items enumerated in other referenced sections, none of which cite pension funds or IRAs as exclusions.[7]

¶ 9. Keip argues, however, that if we begin our analysis with the SSI eligibility statutes and regulations, as she claims we must, the only reasonable interpretation of the spousal impoverishment provisions is that her IRA must be excluded for eligibility

---

[7] *See* 42 U.S.C. § 1396r–5(c)(1) and (5) (1994).

determination purposes, even under the latter enactment. Under 42 U.S.C. § 1396a(a)(10)(C)(i) and 42 U.S.C. § 1396a(r)(2)(A), state MA programs are required to be "no more restrictive" in their methodology for determining MA eligibility than are the federal SSI regulations. That is, a state may establish different MA eligibility criteria, so long as under the state criteria, "additional individuals may be eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance." *See* 42 U.S.C. § 1396a(r)(2)(B) (1994). And, because a federal regulation excludes IRAs owned by an ineligible spouse from being deemed a resource of his or her SSI-eligible spouse,[8] Keip argues that her IRA must likewise be excluded as a resource in determining Walter's eligibility for MA. Keip contends further that there is nothing in the spousal impoverishment provisions that is "inconsistent" with the exclusion of her IRA, and neither is there language in 42 U.S.C. § 1396r–5 which "specifically provides" that the IRA exclusion is superseded.

■

¶ 10. As we have noted, statutory interpretation is a question of law, and we review the department's decision, not that of the trial court. Our objective is to ascertain the intent of the legislature, or in this case, the U.S. Congress. *See Truttschel v. Martin*, 208 Wis. 2d 361, 365, 560 N.W.2d 315, 317 (Ct. App. 1997). We first look to the plain language of a statute to discern legislative intent. *See Anderson v. City of Milwaukee*, 208 Wis. 2d 18, 25, 559 N.W.2d 563, 566 (1997). If the plain language of the statute clearly sets forth the legislative intent, we apply the statute accordingly to the

---

[8] *See* 20 C.F.R. § 416.1202(a) (1999).

facts and circumstances before us. *See Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 327, 548 N.W.2d 519, 522 (1996). If the statute's language is ambiguous, however, we will consult its legislative history, scope, context and purpose in order to apply the statute consistent with the legislature's intent. *See id.*

■

¶ 11. Whether a statute is ambiguous is also a question of law. *See Awve v. Physicians Ins. Co.*, 181 Wis. 2d 815, 822, 512 N.W.2d 216, 218 (Ct. App. 1994). A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different ways. *See State v. Setagord*, 211 Wis. 2d 397, 406, 565 N.W.2d 506, 510 (1997). We conclude that the relevant provisions of the spousal impoverishment law are ambiguous with respect to whether the exclusion under SSI regulations for an ineligible spouse's IRA remains viable under the subsequently enacted spousal impoverishment provisions. Reasonably well-informed persons could conclude from the cited provisions that the exclusions referred to in the spousal impoverishment law replace any and all asset exclusions specified under SSI eligibility rules and regulations. On the other hand, a reasonably well-informed person familiar with SSI/MA eligibility criteria could conclude just the opposite, given Congress's prior directions that state MA eligibility rules be no more restrictive than SSI criteria, and its subsequent declaration that "the determination of what constitutes ... resources"[9] was not altered by the spousal impoverishment provisions, absent a specific provision to the contrary.

---

[9] *See* 42 U.S.C. § 1396r–5(a)(3)(A) (1994).

¶ 12. Thus, the federal MA eligibility statutes and regulations interpreted by the department are ambiguous with respect to the question at hand. Our next task, therefore, is to determine what level of deference, if any, we are to accord the department's interpretation. *See Schroeder v. Dane County Bd. of Adjustment*, 228 Wis. 2d 324, 334 n.3, 596 N.W.2d 472, 478 (Ct. App. 1999). The supreme court has identified three distinct levels of deference granted to agency decisions: great weight deference, due weight deference and de novo review. *See Jicha v. DILHR*, 169 Wis. 2d 284, 290–91, 485 N.W.2d 256, 258–59 (1992). Keip argues that our review should be de novo, either because the language of the federal statutes plainly retains the exclusion for Caryl's IRA, or because the question is one of first impression in Wisconsin. Surprisingly, the department does not request that we accord its interpretation due or great weight deference. Rather, it concedes that our review is de novo, ostensibly because a question of law is presented.

¶ 13. We conclude that the parties are correct that our review in this case must be de novo, but not for the reasons either has cited. The supreme court concluded in *Tannler v. Department of Health & Social Services*, 211 Wis. 2d 179, 185, 564 N.W.2d 735, 739 (1997), that a decision by the department based on guidance contained in its *Medical Assistance Handbook* is entitled to due weight deference. Here, however, the department's decision to include Caryl's IRA when determining Walter's eligibility for MA is *not* based on guidance in the *MA Handbook*. In fact, the department's present interpretation is inconsistent with the relevant provision in its *MA Handbook*.

¶ 14. The *MA Handbook*'s appendix regarding "Spousal Impoverishment" provides guidelines for determining the "countable assets" of an institutionalized person and his or her community spouse, for the purpose of arriving at the "community spouse asset share."[10] *See MA Handbook*, Appendix 23.0.0. The *MA Handbook* gives the following guidance to department personnel:

> 23.4.0 <u>Assets</u>
> Count the combined assets of the institutionalized person and his/her community spouse. . . . Add together all countable, available . . . assets the couple owns. . . .
> Don't count the following assets:
> . . .[Homestead property, one vehicle, burial funds, household goods, personal items, and]
> *5. All assets not counted in determining SSI-related MA eligibility.*

(Emphasis added.) We agree with Keip that this *MA Handbook* provision strongly implies that the department had previously concluded that an asset of either spouse excluded under federal SSI-eligibility regulations must also be excluded when determining MA eligibility under the spousal impoverishment provisions.

■

¶ 15. Thus, we will review the department's contrary interpretation in this case de novo. *See Ufe, Inc. v. LIRC*, 201 Wis. 2d 274, 285, 548 N.W.2d 57, 62 (1996)

---

[10] "The community spouse asset share . . . is the amount of countable assets above $2,000 that the community spouse, the institutionalized person, or both, can possess at the time the institutionalized person *applies for MA*." *See MA Handbook*, Appendix 23.2.2.

(noting that a de novo standard of review is appropriate when an agency's position on an issue has been inconsistent). The dispositive question thus becomes: which interpretation, the department's or Keip's, is more in keeping with Congress's intent when it enacted the spousal impoverishment provisions, as evidenced by such things as the history, scope, context and purpose of those provisions? We conclude that the more reasonable interpretation is that Congress did not intend to make it more difficult for a community spouse to remain self-sufficient by requiring that spouse to spend down or diminish the value of a pension fund or IRA in order to render his or her institutionalized spouse eligible for MA.

¶ 16. The department itself has described the purpose of the spousal impoverishment provisions as follows:

> The policy's purpose is to prevent the impoverishment of the community spouse. Before enactment of the [spousal impoverishment provisions], the community spouse was legally obligated to provide financial support to the institutionalized person. After enactment, s/he is allowed to have substantial assets and income without liability for the institutionalized spouse and without affecting the MA eligibility of the institutionalized spouse.

*MA Handbook*, Appendix 23.1.0. The department's description is consistent with the explanation contained in the House Report regarding the spousal impoverishment provisions: "The purpose of these revisions is to assure that the community spouse in these circumstances has income and resources sufficient to live with independence and dignity." H.R. REP. No. 100–105(II), at 69 (1988), *reprinted in* 1988 U.S.C.C.A.N. 803, 892.

¶ 17. Similarly, if we consider the scope and context of the spousal impoverishment provisions enacted in 1988, it seems clear that congressional intent was to preserve existing exclusions, while increasing the amount of assets a community spouse may retain. Except as the new provisions "specifically" provide, the "determination of what constitutes . . . resources" was not to change under the spousal impoverishment provisions.[11] As the Elder Law Section of the State Bar notes in its amicus brief, nothing in the 1988 provisions specifically overrides the resource definitions applicable when there is one spouse who is eligible for SSI or MA and one who is not.[12] The provision the department cites, 42 U.S.C. § 1396r–5(c)(5), simply incorporates by reference a list of resources that are excluded when *both* spouses are eligible for SSI. We agree with the Elder Law Section that it is not reasonable to read that reference as signaling Congress's intent that other exclusions, such as those applicable when one spouse is SSI/MA-eligible and the other is not, were superseded.[13]

¶ 18. At bottom, the department's interpretation rests on the maxim "inclusio unius est exclusio alterius," a rule of construction that to "include one thing implies the exclusion of the other." BLACK'S LAW DICTIONARY 602 (7th ed. 1999). The department finds

---

[11] *See* 42 U.S.C. § 1396r–5(a)(3) (1994).

[12] See 42 U.S.C. § 1382c(f)(1) (1994) and 20 C.F.R. §§ 416.1202 and .1210 (1999).

[13] The House Report regarding the spousal impoverishment provisions explains that "the bill generally does not alter current law as to what income or resources are countable, and which are not, or how income or resources are valued." H.R. REP. No. 100–105(II), at 70 (1988), *reprinted in* 1988 U.S.C.C.A.N. 803, 893.

support for its position in *Mistrick v. Division of Medical Assistance*, 712 A.2d 188 (N.J. 1998).[14] The New Jersey Supreme Court enunciated two reasons in *Mistrick* for embracing the department's present interpretation: (1) the exclusion for an IRA held by an ineligible spouse of an SSI-eligible person applies only if the two live in the same household; and (2) all earlier statutes that contained a "no more restrictive" provision are superceded by the spousal impoverishment provisions. *See id.* at 196–97. We are not persuaded, however, by either rationale.

¶ 19. First, although it is true that the SSI rule which excludes an ineligible spouse's IRA as a countable asset applies only if the spouses are living together, that is because assets of the ineligible spouse are only deemed attributable to the eligible spouse if the couple is living together.[15] Moreover, under applicable MA eligibility criteria, the Keips are considered to have been living together at the time of Walter's first institutionalization in October 1996, notwithstanding his temporary absence for care and treatment. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, PROGRAM OPERATIONS MANUAL, SI 00501.154 (1990).

¶ 20. Thus, only the *Mistrick* court's second rationale is relevant on the present facts. As we have discussed above, the purpose, scope and context of the statutory provisions at issue all weigh against invoking a rule of construction that would interpret Congres-

---

[14] The department also calls our attention to an unpublished opinion of the Court of Appeals of Ohio, *Martin v. Ohio Department of Human Services*, No. 98-CA–7, 1998 WL 801416 (Ohio Ct. App. Nov. 20, 1998), which adopted the New Jersey Supreme Court's reasoning in *Mistrick*, noting explicitly the *inclusio unius* maxim as a basis for its decision.

[15] *See* 42 U.S.C. § 1382c(f)(1) (1994).

sional silence as effectively repealing a resource exclusion otherwise available to the community spouse of an institutionalized person.

¶ 21. The department contends, however, that Congress sought to achieve a second purpose when it enacted the spousal impoverishment provisions, and it suggests that its interpretation is consistent with that purpose. The *Mistrick* court described the secondary goal of the spousal impoverishment provisions as follows:

> Congress also recognized that because the allocation of resources depended wholly on whether a resource was in the name of one spouse or the other, couples could shelter their resources in the name of the community spouse while the institutionalized spouse would receive Medicaid coverage. . . . [The spousal impoverishment provisions] closed this loophole by considering a couple's resources in their entirety, regardless of the name in which the resources were held.

*Mistrick*, 712 A.2d at 194–95 (citations omitted). We fail to see how eliminating the exclusion for a spouse's pension or IRA, an exclusion that was explicitly recognized under SSI/MA eligibility rules prior to enactment of the spousal impoverishment provisions, assists in "closing a loophole" exploited by asset transfers between spouses. Employee pension funds and IRAs are not readily transferable between spouses.[16] They

---

[16] An employee-spouse's interest in an employer-administered pension fund or retirement plan would not likely be transferable to a nonemployee-spouse, except perhaps in the form of survivorship benefits or pursuant to court order in a divorce. The liquidation of an IRA in the name of one spouse would trigger significant adverse tax consequences, and the

are thus not the type of assets that could easily be retitled on the eve of the owning spouse's institutionalization.[17]

■

¶ 22. In summary, we conclude that the more reasonable interpretation of 42 U.S.C. § 1396r–5 is that the statute does not remove the exclusion for an IRA held by a community spouse when an institutionalized spouse applies for MA. The ineligible spouse's IRA would be excluded in determining whether the applying spouse would be eligible for SSI, and Wiscon-

---

attempted re-establishment of the account in the name of the other spouse would be subject to annual contribution limitations, as well as certain earned income requirements. If married couples were evading MA resource restrictions prior to the enactment of the spousal impoverishment provisions by transferring assets from the institutionalized spouse to the community spouse, it is unlikely that they were doing so with pension funds or IRAs.

[17] The department's interpretation also will not necessarily result in the saving of public funds. The Coalition of Wisconsin Aging Groups, in its amicus brief, points out that the failure to exclude Caryl's IRA as an asset actually resulted in higher MA payments for Walter after August 1, 1997. Caryl's conversion of half the value of her IRA to an irrevocable, fixed-payment annuity in order to drop below the allowable community spouse asset share, resulted in a decrease in her monthly income from $2300 to $1635. The latter figure was below the "minimum monthly maintenance needs allowance" to which a community spouse is entitled, and thus, a portion of Walter's income was diverted to Caryl instead of paying for his care, with MA making up the difference. In addition, the Coalition suggests that the drop in Caryl's income makes it more likely that she will need government assistance in the future, and in a greater amount, than would be the case had she been able to maintain her original IRA without compromising Walter's eligibility for MA.

sin's MA eligibility criteria may not be more restrictive than federal SSI eligibility requirements. The spousal impoverishment provisions only supersede those SSI eligibility criteria which are inconsistent with the provisions of § 1396r–5. In particular, the determination of what constitutes countable resources for eligibility purposes is unaffected unless the section "specifically provides" for different treatment. Nothing in § 1396r–5 specifically overrides the treatment of spousal IRAs for purposes of MA eligibility determinations, and reading in a repeal of the exclusion would be contrary to the primary purpose of the spousal impoverishment provisions.

¶ 23. Keip also argues that "requiring community spouses to convert their pension funds to irrevocable fixed annuities tested against different life expectancies for men and women, illegally discriminates on the basis of sex." When Keip liquidated a portion of her IRA to purchase an MA-qualifying annuity, her payments were calculated on the basis of sex-based life expectancy tables, which provide smaller annuity payments for women than for men. Because of this, Keip claims that the department's decision to include her IRA as an asset in determining Walter's eligibility for MA resulted in gender-based discrimination against her. Because we have concluded that the department erred in its determination that Keip's IRA was an includible asset for purposes of determining Walter's eligibility, we do not address whether the determination was also wrongful for the additional reason Keip asserts.

¶ 24. Finally, we note that in the conclusion to her brief, Keip asks us to direct that she be awarded $20,000 in damages "to compensate for her losses due to the unnecessary forced purchase of an irrevocable

annuity." We decline to do so. Keip's petition to the circuit court sought only judicial review of the department's decision under Chapter 227, STATS. And, although Keip's petition alleges that she suffered damages as a result of the department's ruling, it articulates no cause of action or legal theory on which damages might be awarded. In her reply brief, Keip asserts that the court could order the department to pay damages under § 227.57(9), STATS., which provides that a court's decision on judicial review "shall provide whatever relief is appropriate. . . ." We are unpersuaded. We conclude that the only relief to which Keip is entitled in this action is the reversal of the department's ruling that Walter was ineligible for MA before August 1, 1997, on account of Caryl's IRA. *Cf. Coleman v. Percy*, 86 Wis. 2d 336, 341, 272 N.W.2d 118, 121 (Ct. App. 1978) (concluding that "[d]amages may not be awarded on certiorari," in part because "[t]he return to a writ of certiorari is merely a certification of the record of the proceedings to be reviewed").

## CONCLUSION

¶ 25. For the reasons discussed above, the circuit court's order is reversed, and the cause is remanded with instructions that the matter be further remanded to the department for proceedings and disposition consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.