Shannon PRESTON and Charles Johnson,
Individually and as Special Administrator of the
Estate of Bridon Michael Johnson, deceased,
Plaintiffs-Appellants,†

v.

MERITER HOSPITAL, INC. and The Wisconsin
Patients Compensation Fund,
Defendants-Respondents.

Court of Appeals

*No. 2006AP3013. Submitted on briefs August 7, 2007.
—Decided January 24, 2008.*

2008 WI App 25

(Also reported in 747 N.W.2d 173.)

† Petition to review denied 4/14/08.

704

705

706

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *John L. Cates* and *Michael J. Luebke* of *Gingras, Cates & Luebke, S.C.*, Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Curtis C. Swanson* and *David J. Pliner* of *Corneille Law Group, L.L.C.*, Madison.

Before Dykman, Vergeront and Bridge, JJ.

¶ 1. BRIDGE, J. Shannon Preston appeals an order granting summary judgment in favor of Meriter Hospital on her claim under the Emergency Medical Treatment and Labor Act (EMTALA) related to the death of her son, who was born prematurely in Meriter's birthing center. The circuit court held that, based on the undisputed facts, the EMTALA's medical screening requirement does not apply to inpatients. It held further that because Preston was admitted as an inpatient when she was taken to the birthing center the night her son was born, her son necessarily became an inpatient for purposes of EMTALA coverage at the same time, and remained so during his birth and through his death. We agree and affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2. This case is before us a second time. The underlying facts and procedural history of the case are as follows.

¶ 3. For purposes of this appeal, the following facts are undisputed. Shannon Preston arrived at Meriter Hospital on November 9, 1999 at 5:33 p.m. She was twenty-three and 2/7th weeks pregnant. She was admit-

ted to the hospital and taken to Meriter's birthing center. At 3:55 a.m. she gave birth to a son she named Bridon Michael Johnson. The child weighed one and one-half pounds at birth and could not survive without resuscitation and the administration of oxygen and fluids. Except for nursing care, Meriter did not resuscitate or treat the child, who survived for two and one-half hours.

¶ 4. Preston sued Meriter for: (1) medical negligence; (2) failing to obtain informed consent; (3) neglecting a patient in violation of WIS. STAT. § 940.295(1)(j)1. (1997–98);[1] and (4) violating EMTALA, 42 U.S.C. § 1395dd (1994).[2] The circuit court granted Meriter's motion for summary judgment on all four of Preston's claims. It dismissed her medical malpractice claim for failure to identify an expert witness. It dismissed her claim for patient neglect because § 940.295(1)(j)1. is part of the criminal code and does not create a private cause of action. It dismissed her informed consent claim because such claims cannot be brought against a hospital. It also dismissed her EMTALA claim.

¶ 5. Preston appealed the dismissal of all of her claims except the claim under WIS. STAT. § 940.295(1)(j), and we affirmed the circuit court's ruling. *See Preston v. Meriter Hosp., Inc. (Preston I)*, 2004 WI App 61, 271 Wis. 2d 721, 678 N.W.2d 347. We analyzed whether Meriter violated EMTALA's "screening requirement," which obligates a hospital with an emergency department to provide an appropriate medical screening examination to any individual who "comes to the emergency

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

[2] We will refer to Shannon Preston, Charles Johnson and the Estate of Bridon Michael Johnson collectively as Preston. All references to the United States Code are to the 1994 version unless otherwise noted.

department" with a request to be examined or treated for a medical condition. *See* 42 U.S.C. § 1395dd(a). Construing the term "comes to the emergency department," we concluded that the screening requirement applied only to patients brought to a hospital emergency room. *See Preston I*, 271 Wis. 2d 721, ¶ 37. Because Bridon entered the hospital via the birthing center and not through the emergency room, we concluded that 42 U.S.C. § 1395dd(a) did not impose a screening requirement on Meriter.. *See id.*, ¶ 39.

¶ 6. Preston sought review of our ruling on this issue, which the supreme court granted. *See Preston v. Meriter Hosp., Inc.* (*Preston II*), 2005 WI 122, 284 Wis. 2d 264, 700 N.W.2d 158. The supreme court reversed the dismissal of the EMTALA screening claim.[3] *Id.*, ¶ 42. The supreme court's ruling was based on its determination that the phrase "comes to the emergency department" applies to the hospital's birthing center as well as to its emergency room. *See id.*, ¶ 38.

¶ 7. The majority opinion did not address the issue raised in the present appeal, namely whether the screening requirement applies to inpatients or whether the newborn infant of a woman who is herself admitted to the hospital is also an inpatient by virtue of the mother's admission. The majority referenced the "inpatient" issue in a single footnote:

> Meriter raises the argument that EMTALA does not apply to Bridon because he was admitted to Meriter as an inpatient. Since we are reviewing this matter as if a

---

[3] The court first observed that Preston had arguably waived her EMTALA claim for failure to screen, but exercised its discretion to consider the merits of the issue. *See Preston v. Meriter Hosp., Inc.* (*Preston II*), 2005 WI 122, ¶ 17, 284 Wis. 2d 264, 700 N.W.2d 158.

> motion to dismiss had been granted, we have considered only whether the facts and inferences in the complaint state a claim under EMTALA's screening requirement. Therefore, we disregard subsequent factual revelations and the legal conclusions that follow from those facts for purposes of this decision. Accordingly, based solely on the complaint, we hold that Preston has pleaded an EMTALA screening claim.

*Id.*, ¶ 39 n.12. The majority decision was authored by Justice Prosser, with whom four other justices joined.

¶ 8. Justice Roggensack authored a detailed dissent in which Justice Wilcox joined. Although the dissent agreed with the court's ruling that the phrase "comes to the emergency department" applies to the birthing center, Justice Roggensack observed that the majority's analysis of EMTALA "overlooks Bridon's status as an inpatient." *Id.*, ¶ 47 (Roggensack, J., dissenting). Instead, Justice Roggensack would have held as a matter of law that: (1) the EMTALA screening requirement does not apply to hospital inpatients, and (2) Bridon became an inpatient when his mother was admitted before his birth. *Id.* Thus, Justice Roggensack determined that Bridon was an inpatient rather than someone who "comes to the emergency department," and concluded that Preston's claim fell outside the scope of EMTALA and instead sounded in Wisconsin medical malpractice law. *Id.*, ¶ 52 (Roggensack, J., dissenting).

¶ 9. A four-person concurrence authored by Justice Crooks emphasized that the inpatient issue was not addressed by the majority and indicated that the parties should brief the issue on remand:

> I write to address that portion of the dissent that addresses the issue of whether or not Bridon was an inpatient for purposes of EMTALA.

711

The majority did not address that issue . . . . While the dissent suggests a roadmap for such a determination, it is merely the opinion of one justice. The issue of whether a newborn infant is considered an inpatient upon his or her mother's admission to a hospital has yet to be determined by this, or to our knowledge any other, court. The question is complicated further by the circumstances of this case, in which the hospital never intended to, nor did it, provide any treatment to Bridon. As the court of appeals' decision is reversed, and this case is remanded to the circuit court for further proceedings, the parties should fully brief this issue for the circuit court's consideration.

*Id.*, ¶¶ 43–44 (Crooks, J., concurring). Justice Prosser did not join the concurrence.

¶ 10. On remand, Meriter moved for summary judgment on the inpatient issue. The circuit court granted the motion, ruling that, as a matter of law, the EMTALA screening requirement does not apply to patients admitted to the hospital. Further, the circuit court ruled as a matter of law that because Preston was admitted as an inpatient when she was taken to the hospital birthing center, Bridon necessarily became an inpatient at the same time and remained so until his subsequent death. The court's opinion largely tracked the reasoning of Justice Roggensack's dissent in *Preston II*. Preston appeals.

## RELATIONSHIP BETWEEN PRESTON II AND THE PRESENT APPEAL

¶ 11. Preston argues that, although two Justices of the court took the position that Bridon should be considered as "automatically" admitted upon the admission of his mother, the majority opinion rejected this conclusion. In particular, Preston contends that by

holding that a newborn has come to a birthing center for purposes of the screening requirement, the court implicitly held that the screening requirement continues to be in effect even after a patient's admission.

¶ 12. The supreme court's decision can be read as Preston proposes, but only if one overlooks the court's direction that the inpatient issue be addressed on remand. *See Preston II*, 284 Wis. 2d 264, ¶ 44. We agree with the circuit court's observation that by this direction, the supreme court suggested that the question of Bridon's inpatient status could affect the validity of Preston's screening requirement claim. We therefore conclude that it was appropriate for the circuit court to reach and resolve this issue, and we do likewise.

## DISCUSSION

¶ 13. Summary judgment is appropriate when there are no issues of material fact and one party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2005–06). When we review a circuit court's grant or denial of summary judgment, we use the same methodology as the circuit court and our review is de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

¶ 14. EMTALA is commonly referred to as the "Anti-Patient Dumping Act." *Preston II*, 284 Wis. 2d 264, ¶ 24. It was enacted in 1986 in response to widely publicized reports of hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment. *See, e.g., Harry v. Marchant*, 291 F.3d 767, 770, 772 (11th Cir. 2002).

¶ 15. Under EMTALA, hospital emergency rooms are subject to two primary obligations, commonly referred to as the "screening requirement" and the "sta-

bilization requirement." *See* 42 U.S.C. § 1395dd(a) and (b). The screening requirement obligates hospital emergency rooms to provide an appropriate medical screening to any individual seeking treatment in order to determine whether the individual has an emergency medical condition. 42 U.S.C § 1395dd(a). If an emergency medical condition exists, the hospital is obligated to provide stabilization treatment before transferring the individual. 42 U.S.C. § 1395dd(b).

¶ 16. The provisions relevant to our analysis are as follows:

§ 1395dd. Examination and treatment for emergency medical conditions and women in labor.

(a) Medical screening requirement.

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor.

(1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . .

(f) Preemption

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

¶ 17. Preston's only surviving claim on remand is her claim under the EMTALA screening requirement. The sole question before us is whether the EMTALA requires a hospital to provide appropriate medical screening to a newborn infant born at the hospital after the infant's mother has been admitted and is therefore an inpatient.

*Application of EMTALA*
*Screening Requirement to Inpatients*

¶ 18. In resolving this issue, we are required to interpret the EMTALA screening requirement, 42 U.S.C. § 1395dd(a). Interpretation of a federal statute is a question of law that we review de novo. *GMAC Mortgage Corp. v. Gisvold*, 215 Wis. 2d 459, 471, 572 N.W.2d 466 (1998). Our objective is to determine the intent of Congress. *See Keip v. DHFS*, 2000 WI App 13, ¶ 10, 232 Wis. 2d 380, 606 N.W.2d 543.

¶ 19. We employ the same methodology to interpret a federal statute as we do when we interpret a state

statute. *Northwest Airlines, Inc. v. DOR*, 2006 WI 88, ¶ 36, 293 Wis. 2d 202, 717 N.W.2d 280. We look first to the language of the statute itself. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. When the statutory language is clear and unambiguous, we do not look beyond the plain words, although legislative history may be consulted to confirm or verify a plain-meaning interpretation. *Id.* If the statutory language is ambiguous, then we may use relevant extrinsic sources, including administrative regulations and legislative history to ascertain the legislatively intended meaning. *Keup v. DHFS*, 2004 WI 16, ¶ 17, 269 Wis. 2d 59, 675 N.W.2d 755.

¶ 20. EMTALA is silent as to whether the screening requirement applies to inpatients. Statutory silence can create ambiguity, *see Sutton v. Kaarakka*, 168 Wis. 2d 160, 166, 483 N.W.2d 259 (Ct. App. 1992), and we conclude that it does so here. We must therefore look to extrinsic sources for guidance in determining the legislative intent of the Act.

¶ 21. As noted above, EMTALA was enacted to prevent the practice of "patient dumping." *See Preston II*, 284 Wis. 2d 264, ¶ 24. Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law offers no claim for failure to provide emergency care. *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir. 1993) (recognizing that EMTALA's purpose is simply to impose on hospitals the legal duty to provide emergency care that they would otherwise not have under traditional state tort law). *See also Correa v. Hospital San*

*Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).

¶ 22. In prescribing minimal standards for screening and stabilizing patients, but not for patient care outside of these two narrowly defined contexts, Congress confined EMTALA solely to address its concerns regarding emergency treatment, and, at the same time, avoided supplanting available state malpractice and tort remedies. *See Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1166 (9th Cir. 2002); *Harry*, 291 F.3d at 773; *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 798–99 (10th Cir. 2001); *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000); *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998); *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 350–52 (4th Cir. 1996); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) (en banc) ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms."); *Gatewood*, 933 F.2d at 1041; and *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990).

¶ 23. In 2003, the Department of Health and Human Services issued regulations interpreting EMTALA. One of these regulations, 42 C.F.R. § 489.24 (2003), clarifies that EMTALA's stabilization requirement does not apply once a patient is admitted to a hospital. We discuss the regulation in detail below. In order to provide a context for that discussion, it is helpful to review cases which addressed the inpatient issue before the clarifying regulation was promulgated.

717

¶ 24. In *Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999), a patient arrived at the hospital with normal labor pains. She was examined and admitted to the maternity ward, and a cesarean section was performed. *Id.* at 171. The patient gave birth to a baby boy who emerged with severe respiratory and pulmonary problems. *Id.* The infant was transferred to a hospital with a functional neonatal intensive care unit without first being stabilized, and he later died. *Id.* The patient brought an action under the EMTALA stabilization requirement. The issue before the court was whether the stabilization requirement was limited to entries via the emergency room.

¶ 25. The First Circuit Court of Appeals concluded that while the screening requirement applies to individuals who seek assistance at an emergency room, the stabilization requirement obligates hospitals to stabilize individuals wherever in the hospital they may be, whenever emergency medical conditions are detected. *Id.* at 175. The court made the following observation:

> Congress's preoccupation with patient dumping is served, not undermined, by forbidding the dumping of *any* hospital patient with a known, unstabilized, emergency condition. After all, patient dumping is not a practice that is limited to emergency rooms. If a hospital determines that a patient on a ward has developed an emergency medical condition, it may fear that the costs of treatment will outstrip the patient's resources, and seek to move the patient elsewhere. That strain of patient dumping is equally as pernicious as what occurs in emergency departments, and we are unprepared to say that Congress did not seek to curb it.

*Id.* at 177 (emphasis in original).

¶ 26. In *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990), the Sixth Circuit Court of Appeals earlier reached the same conclusion after determining that such a reading of the Act would prevent hospitals from seeking to avoid EMTALA liability by employing the subterfuge of admitting emergency room patients and then immediately discharging them without first stabilizing them. *Id.* at 1135. The court stated:

> A fairer reading [of the Act] is that Congress sought to insure that patients with medical emergencies would receive emergency care. Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of the Act merely by admitting an emergency room patient to the hospital, then immediately discharging the patient. Emergency care must be given until the patient's emergency medical condition is stabilized.

*Id.*

¶ 27. In contrast with the outcome in *Lopez-Soto* and *Thornton*, several other jurisdictions concluded that EMTALA does not apply to inpatients. In *Bryan*, the patient was transferred to the hospital from another facility for treatment of respiratory distress. *Bryan*, 95 F.3d at 350. After twelve days of treatment, the hospital determined that no further efforts to prevent the patient's death should be made, and when the patient faced a life-threatening episode, the hospital allowed the patient to die. *Id.* The patient's family brought an EMTALA claim, alleging a violation of the stabilization requirement. *Id.*

¶ 28. The Fourth Circuit Court of Appeals reviewed the legislative history of EMTALA, including

the fact that the core purpose of the statute is to get patients into the system who would otherwise go untreated. *Id.* at 351. The court concluded that the stabilization requirement applies only in the context of a possible transfer of the patient. *Id.* at 352. From this, the court reasoned that the stabilization requirement regulates the hospital's care of the patient only in the immediate aftermath of the act of admitting the patient for emergency treatment while the hospital considers whether it will undertake longer-term full treatment on-site or instead transfer the patient to a hospital that could undertake that treatment. *Id.* Thus, it held that the stabilization requirement is not of indefinite duration. *Id.* at 351.

¶ 29. In *Bryant*, the patient sought care at a hospital's emergency room and was eventually admitted to the hospital where he was treated for three days. The patient was then transferred to another hospital and subsequently died. *Bryant*, 289 F.3d at 1164. In reviewing the applicability of the stabilization requirement to these facts, the Ninth Circuit Court of Appeals held that the stabilization requirement normally ends when a patient is admitted as an inpatient. *Id.* at 1167. As did the Fourth Circuit in *Bryan*, the Ninth Circuit determined that the stabilization requirement was defined entirely in connection with the immediate aftermath of admission and consideration of a possible transfer, rather than in the context of a patient's long-term care within the system. *Id.* In so ruling, the court stated that the stabilization requirement "cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context." *Id.*

¶ 30. Likewise, in *Harry*, the Eleventh Circuit Court of Appeals concluded that the stabilization requirement does not impose a federal statutory obliga-

tion on a hospital to provide stabilization treatment to a patient with an emergency medical condition who is not transferred and instead remains an inpatient.[4] *Harry*, 291 F.3d at 768.

¶ 31. In addition to the cases construing the stabilization requirement, one federal appellate decision specifically also addressed the applicability of the *screening* requirement once a patient is admitted to a hospital. In *Reynolds*, the First Circuit Court of Appeals held that the screening requirement does not apply to inpatients because "[t]he fact that Mr. Reynolds was in the hospital receiving treatment is a *prima facie* showing that the purpose of subsection (a) [the screening requirement] was satisfied; any failures of diagnosis or treatment were then remediable under state medical malpractice law." *Reynolds*, 218 F.3d at 82, 83 (emphasis in original).

¶ 32. We next consider the 2003 DHHS clarifying regulation. Because EMTALA is ambiguous as to its applicability to inpatients, it is appropriate to look to extrinsic sources such as agency regulations for guidance in determining the legislative intent of the Act. *See Preston II*, 284 Wis. 2d 264, ¶ 23. The 2003 regulation provides in part as follows:

> (2) Exception: Application to inpatients. (i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the

---

[4] *See also Dollard v. Allen*, 260 F. Supp. 2d 1127, 1135 (D. Wyo. 2003) (citations omitted) (EMTALA's stabilization requirement "does not apply to individuals that have been admitted to the hospital for inpatient care. A different reading of EMTALA renders the Act's preemption subsection superfluous.").

emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24 (2003).

¶ 33. We are to review DHHS's construction of the EMTALA stabilization requirement in accordance with *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). *See Preston II,* 284 Wis. 2d 264, ¶ 28. Under *Chevron,* the determination of the proper deference to afford an agency interpretation is a two-step process. *See Chevron,* 467 U.S. at 842–43. We are first to determine if the statute is ambiguous or silent on the precise question before us. *Id.* Because the statute in the present case is silent on the question before us, we proceed to the second step in which we are to determine whether the agency's interpretation is "a permissible construction of the statute." *See id.* at 843.

¶ 34. Courts employ one of two tests to determine whether an agency's interpretation is permissible. If Congress expressly delegated rule-making authority to an agency with respect to the subject matter in question, the agency's interpretation is permissible unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. Alternatively, if Congress's delegation of authority to an agency is by implication rather than given expressly, the agency's interpretation is permissible unless it is unreasonable. *Id.* at 844.

¶ 35. Congress expressly delegated to DHHS the authority to make and publish rules concerning EMTALA. *See Preston II,* 284 Wis. 2d 264, ¶ 31. Accordingly, we must give DHHS's interpretation of the applicability of the screening requirement to inpatients

controlling weight unless it is arbitrary or capricious. *See Chevron*, 467 U.S. at 844. *See also Preston II*, 284 Wis. 2d 264, ¶ 28.

¶ 36. Under the "arbitrary and capricious" standard, the scope of review is narrow, and we are not to substitute our judgment for that of the agency. *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A regulation may be arbitrary or capricious if:

> [T]he agency [1] has relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* However, if the agency can satisfactorily explain its regulatory decision and if there is a "rational connection between the facts found and the choice made," we are to defer to the agency. *Id.*

¶ 37. We conclude that the DHHS regulation which provides that the EMTALA stabilization requirement does not apply to inpatients is not arbitrary and capricious for several reasons.

¶ 38. First, after DHHS drafted its proposed regulations in 2003, it solicited public comments and took into account a range of objections from interested parties. DHHS prepared a lengthy response to the comments received, and discussed the reasons for its decision to exclude coverage under EMTALA once a person is admitted to a hospital. *See* Medicare Program; Clarifying Policies Related to the Responsibilities of

Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53222, 53243–48.

¶ 39. Although DHHS had earlier proposed that EMTALA should apply to inpatients, it changed its mind after considering concerns raised by commentators and court rulings to the contrary. In DHHS's comments accompanying 42 C.F.R. § 489.24, it explained the reasons for its decision:

> Scope of EMTALA Applicability to Hospital Inpatients (§ 489.24(d)(2))
>
> A. Background and Provisions of the Proposed Rule
>
> While most issues regarding EMTALA arise in connection with ambulatory patients, questions have occasionally been raised about whether EMTALA applies to inpatients . . . . After reviewing the issue in the light of the EMTALA statute, in the May 9, 2002 proposed rule (67 FR 31475), we proposed that EMTALA would apply to admitted emergency patients until they have been stabilized.
>
> . . . .
>
> B. Summary of Public Comments and Departmental Responses
>
> 1. Applicability of EMTALA to Inpatients
>
> Comment: Many commenters expressed concern about our clarification in the proposed rule on the applicability of EMTALA to hospital inpatients . . . .
>
> [M]any commenters expressed the view that EMTALA should not apply to any inpatient, even one who was admitted though the dedicated emergency department and for whom the hospital had incurred an EMTALA obligation to stabilize. Several commenters noted that

hospitals have extensive CoPs[5] responsibilities with respect to inpatients or State tort law obligations, and argued that the hospital's assumption of responsibility for the individual's care on an inpatient basis should be deemed to meet the hospital's obligation under EMTALA. Many commenters recommended that the regulations be revised to state that a hospital's EMTALA obligation may be met by admitting an individual as an inpatient.

68 Fed. Reg. 53222, 53243–44 (Sept. 9, 2003).

¶ 40. After discussing federal court decisions that declined to extend the stabilization requirement to inpatients,[6] DHHS reached the following conclusion:

As a result of these court cases, and because we believe that existing hospital CoPs provide adequate, and in some cases, superior protection to patients, we are interpreting hospital obligations under EMTALA as ending once the individuals are admitted to the hospital inpatient care . . . .

We believe that, as the agency charged with enforcement of EMTALA, it is appropriate to pay deference to the numerous Federal courts of appeal that have decided upon this issue. Although the decisions of the courts in these EMTALA private right of action cases are not necessarily binding for our enforcement purposes, we do believe that consistent judicial interpretation of this matter, when combined with the many comments received on this matter, dictate the policy that we articulate in this final rule.

---

[5] Conditions of Participation to receive Medicare & Medicaid Funding.

[6] In particular, DHHS referenced *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002); *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162, 1166 (9th Cir. 2002); and *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 350–52 (4th Cir. 1996).

¶ 41. Second, the final regulation is not arbitrary or capricious because it advances the purpose of EMTALA. The Act was designed to "fill the gap" in legal liability for hospitals' failure to provide proper medical care for emergencies. Once an individual is admitted, the patient's care becomes the legal responsibility of the hospital and the treating physicians. The legal adequacy of that care is then governed by state tort and medical malpractice law which all jurisdictions agree EMTALA was not intended to preempt.

¶ 42. Third, the DHHS regulation is not "manifestly contrary to the statute." As the court observed in *Preston II*, when a statute is ambiguous, "an agency's interpretation cannot, by definition, be found to directly contravene it." *Preston II*, 284 Wis. 2d 264, ¶ 37 (citations omitted).

¶ 43. Just as the supreme court concluded in *Preston II* that DHHS' interpretation of "comes to the emergency department" in 42 C.F.R. § 489.24(a) is permissible, we conclude that DHHS's interpretation of the EMTALA stabilization requirement as it applies to inpatients in 42 C.F.R. § 489.24(b) is also permissible. *Preston II*, 284 Wis. 2d 264, ¶ 38. We therefore conclude that the DHHS interpretation controls regarding whether the stabilization requirement applies to inpatients.

¶ 44. Preston argues that we should not take the DHHS regulation into account because it was not adopted until 2003, and the alleged EMTALA violation in the present case occurred in 1999. In *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 n.3 (1996), the United States Supreme Court responded to an argument that "deferring to [an agency's regulation]

in this case involving antecedent transactions 'would make the regulation retroactive.' " The Court stated:

> There might be substance to this point if the regulation replaced a prior agency interpretation—which, as we have discussed, it did not. Where, however, a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.

*Id.* The same is true here. EMTALA 42 C.F.R. § 489.24 did not replace a prior agency interpretation of the federal statute regarding screening and stabilization. In addition, although several federal appellate courts had ruled that the stabilization requirement ceased to apply once an individual was admitted to a hospital, not all courts had reached the same conclusion. As was the case in *Smiley*, DHHS promulgated the regulation clarifying the status of inpatients under EMTALA to provide guidance where there had been none. We therefore conclude that *Smiley* governs, and that it is appropriate to accord controlling weight to DHHS's interpretation of the stabilization requirement even though the clarification occurred after Bridon's death.

¶ 45. Following issuance of the clarifying regulation, the majority of courts which have reviewed the issue have concluded that the EMTALA screening and stabilization requirements do not apply once an individual is admitted to a hospital for inpatient care. In *Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp. 2d 437, 439 (E.D. Pa. 2004), the patient arrived at the emergency room and was admitted to the hospital, where he remained for five days. Following his discharge, his symptoms worsened and he returned to the emergency room the same day, where he was correctly diagnosed

and stabilized. *Id.* at 440. The patient brought suit, alleging a violation of the EMTALA stabilization requirement.

¶ 46. The Federal District Court reviewed the language of the Act and its legislative history, and discussed the reasoning in prior cases from the Fourth Circuit (*Bryan*), the Ninth Circuit (*Bryant*), and the Eleventh Circuit (concurring opinion in *Harry*) which favored limiting EMTALA to cases where a patient has not been admitted. The court also noted that other circuit courts had refused to limit EMTALA to emergency room patients because "patient dumping is unfortunately not limited to emergency rooms." *Id.* at 446 (citing *Lopez-Soto*, 175 F.3d 170; Thornton, 895 F.2d 1131). The court concluded that, "[t]aking into consideration (1) the language 'comes to a hospital' and a person who 'has an emergency condition,' (2) the legislative history of EMTALA cited by the Fourth Circuit in *Bryan*, and (3) the position of the First and Sixth Circuits that admission not be used as a subterfuge, the most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge." *Mazurkiewicz*, 305 F. Supp. 2d at 447. The court emphasized that it would not assume that hospitals use the admission process as a subterfuge. *Id.* However, it stated that, "If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach." *Id.*

¶ 47. In addition to cases dealing with the stabilization requirement, in decisions issued after the 2003 regulation, several district courts have likewise concluded that the EMTALA screening requirement ends once a patient is admitted to a hospital. *See, e.g., Lopes*

*v. Kapiolani Med. Ctr. for Women & Children*, 410 F. Supp. 2d 939, 948 (D. Haw. 2005) (EMTALA requirements end once a patient is admitted to the hospital); *see also Morgan v. North Mississippi Med. Ctr., Inc.*, 403 F. Supp. 2d 1115, 1127 (S.D. Ala. 2005) (The Court's research has disclosed no authorities, and plaintiff has cited none, in which EMTALA's screening duty has been extended to an inpatient some eight days post-admission to the hospital.); and *Quinn v. BJC Health Sys.*, 364 F. Supp. 2d 1046, 1054 (E.D. Mo. 2005) (citing the DHHS regulation discussed above for the rule that "[i]f the hospital admits the individual as an inpatient for further treatment, the hospital's obligation [under EMTALA] ends.").

¶ 48. In the reply brief, Preston directs our attention to the only case reaching a different result. In *Lima-Rivera v. UHS of Puerto Rico, Inc.*, 476 F. Supp. 2d 92 (D. P.R. 2007), Lima-Rivera, who was thirty-five weeks pregnant, was admitted to a hospital with hypertension and preeclampsia. *Id.* at 94. Despite her preeclampsia and erratic blood pressure, she was discharged two days later. *Id.* She returned to the emergency room with high blood pressure, shortness of breath, preeclampsia, and in labor. *Id.* A cesarean section was performed. *Id.* At the hospital nursery, the baby presented tachypnea and evidence of hypotonia without any action being taken by the hospital. *Id.* The baby's symptoms worsened and he was transferred to the hospital's intensive care unit. *Id.* Some time after, a decision was made to transfer the infant to another hospital, although he was medically unstable. *Id.* The child died two days later. *Id.*

¶ 49. Lima-Rivera brought an action alleging a violation of the stabilization provision of EMTALA. The hospital argued that the court should disregard the

prior First Circuit ruling in *Lopez-Soto*, in light of the 2003 clarifying regulation. *Id.* at 97.

¶ 50. The District Court declined to do so. *Id.* Instead, the court reiterated the concern expressed by the First Circuit in *Lopez-Soto* regarding the "dumping" of patients even after they have been admitted. *See id.* Further, citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995), for the proposition that "interpretive rules 'do not have the force and effect of law' " the court declined to give weight to the DHHS regulation. *Lima-Rivera*, 476 F. Supp. 2d at 97, 98. The court also noted that the clarifying rules were not in effect at the time of the alleged EMTALA violation, and determined that applying the 2003 rules would give them "retroactive effect." *Id.* at 98. The court thus held that Lima-Rivera had stated a claim under the EMTALA's stabilization requirement. *Id.*

¶ 51. For several reasons, we disagree with the reasoning in *Lima-Rivera*. First, and importantly, we view the court's conclusion as inconsistent with Congress's intent that EMTALA not become a federal malpractice statute.

¶ 52. Second, we do not agree that *Shalala* accurately defines the level of deference to be given to the DHHS clarifying regulation, and conclude that the level of deference articulated in *Chevron* is instead applicable. At issue in *Shalala* was the deference to give an informal Medicare reimbursement guideline (PRM § 233) contained in DHHS's Medicare Provider Reimbursement Manual. *Shalala*, 514 U.S. at 91. The Supreme Court noted that "PRM § 233 does not purport to be a regulation and has not been adopted pursuant to the notice-and-comment procedures of the Administrative Procedure Act." *Id.* at 90. Thus, PRM § 233 was an "interpretive rule," rather than a regulation, and was

entitled to lesser deference. *See id.* at 99. In contrast, 42 C.F.R. § 489.24 *is* a regulation which has been adopted pursuant to the Administrative Procedures Act. Thus, the DHHS interpretation is entitled to controlling weight under the *Chevron* test as applied in *Preston II* and as applied above.

¶ 53. Third, the majority of cases decided since the 2003 regulation have reached a conclusion contrary to that in *Lopez-Soto*. In addition, we note that, to the extent that *Lopez-Soto* takes a different approach as a result of its concern about subterfuge, we do not have that situation in the present case.[7] Moreover, in post-2003 decisions such as *Mazurkiewicz*, courts have found a way to address subterfuge by extending EMTALA coverage when the hospital has admitted a patient and immediately discharged him or her for purposes of avoiding liability under EMTALA.

¶ 54. We conclude that a rule curtailing the reach of EMTALA once an individual becomes an inpatient is consistent with the well-accepted principle that EMTALA is not a federal malpractice statute and is not designed to provide a federal remedy for general mal-

---

[7] Preston refers to the "subterfuge" issue for the first time on this appeal and appears to argue that the so-called "subterfuge" exception to the majority rule regarding no inpatient coverage should be invoked here. However, in its Decision and Order for Summary Judgment of February 4, 2003, the circuit court found that "no allegations or proof of subterfuge are raised in this case." Preston did not object to that conclusion, and did not raise it in *Preston I* or *Preston II*, or in response to the hospital's most recent motion for summary judgment. We will generally not decide issues not properly raised in the circuit court. *Evjen v. Evjen*, 171 Wis. 2d 677, 688, 492 N.W.2d 361 (Ct. App.1992).

practice. We also conclude that the DHHS clarifying regulation is controlling as to whether the EMTALA stabilization requirement applies to inpatients. In addition, we conclude that there is no principled basis upon which to distinguish between the screening requirement and the stabilization requirement in the context of a person's status as an inpatient.[8] Once the patient has been admitted, the purpose that underlies the EMTALA screening requirement has already been met, and a patient has recourse for substandard care under state law. Substandard care regarding screening would be subject to a medical malpractice claim just as any substandard care would be. We therefore conclude that the EMTALA screening requirement ceases to apply once an individual has been admitted to a hospital for inpatient care.

*Application of the Screening Requirement to Bridon*

¶ 55. We then turn to the issue whether Bridon was an inpatient at Meriter for purposes of EMTALA coverage. Shannon became an inpatient shortly after she arrived at the hospital while undergoing labor and delivering Bridon in the birthing center. As the circuit court observed, the care that Shannon received during that time was inexorably linked to the fact that she was carrying her unborn child to whom she was about to give birth prematurely. Birth, the very treatment for which Preston presented, was also treatment affecting Bridon. As the hospital argued, to conclude that Bridon was not an inpatient at the hospital under EMTALA

---

[8] Preston does not argue that the two requirements should be differentiated and has repeatedly offered stabilization cases in support of her screening claim.

even though his laboring mother was, would defy common sense.

¶ 56. Preston argues that it has not been established that either Shannon or Bridon were admitted through the Meriter birthing room. Although Preston alleges in her complaint that she was an inpatient at Meriter, she contends that the circuit court should have permitted discovery in order to determine whether a physician made admitting decisions as to them. Preston argues that, rather than accepting what she characterizes as the "admission defense," we should instead treat the decision whether to admit a patient as a factual matter based on a physician's decision and the related admitting documentation in a given case.[9] We disagree. We conclude that, for purposes of coverage under the EMTALA screening requirement, both Shannon and Bridon were inpatients at the time of Bridon's birth as a matter of law. Given our adoption of this legal standard for EMTALA purposes, the factual inquiry into Meriter's admissions policy which Preston urges is both unnecessary and irrelevant.

¶ 57. We conclude that for purposes of the applicability of the EMTALA screening requirement, when a hospital provides inpatient care to a woman that involves treating her fetus simultaneously, the unborn child is a second inpatient, admitted at the same time as the mother.[10] Accordingly, we conclude that, based on

---

[9] As a result, Preston devotes much of her brief to her argument that the circuit court should have permitted discovery on the issue of whether Bridon was an admitted patient, which the court declined to do in light of its ruling that Bridon was an inpatient as a matter of law.

[10] Preston does not argue that Bridon was not admitted because he did not meet the definition of "inpatient" in 42 C.F.R.

the undisputed facts, Bridon was an inpatient for purposes of the screening requirement by virtue of his mother's admission, and because the screening requirement does not apply to inpatients, the Hospital is entitled to judgment as a matter of law.

*By the Court.*—Order affirmed.

§ 489.24(1)(b)(2). Under that provision, an inpatient is "an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services . . . with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight." Shannon Preston obviously met that definition, and Bridon was a "patient within a patient" at the time of her admission, as acknowledged in *Pierce v. Physicians Ins. Co. of Wis.*, 2005 WI 14, 278 Wis. 2d 82, 692 N.W.2d 558.